1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| CONNI CAMPBELL, an individual, | CASE NO. 14cv2359-GPC(RBB) |
|---|---|
| Plaintiff, | **ORDER DENYING DEFENDANT CITY OF SAN DIEGO AND DEFENDANT UNITED STATES' MOTIONS FOR SUMMARY JUDGMENT** |
| vs. | |
| LOCKHEED MARTIN CORPORATION; THE CITY OF SAN DIEGO; UNITED STATES OF AMERICA; AND DOES 1-50, | [Dkt. Nos. 42, 43.] |
| Defendants. | |

11
12
13
14
15
16
17
18
19
20

        Before the Court are Defendant City of San Diego and Defendant United States of America's motions for summary judgment.  (Dkt. Nos. 42, 43.)  Oppositions were filed on January 22, 2016.  (Dkt. Nos. 67, 68.)  Replies were filed on January 29, 2016.  (Dkt. Nos. 69, 70.)   Based on the reasoning below, the Court DENIES both Defendants' motions for summary judgment.

21
22

### Procedural Background

23
24
25
26
27

        On September 18, 2013, Plaintiff filed an amended complaint in San Diego Superior Court against Defendants Lockheed Martin Corporation and the City of San Diego ("the City") for negligence and premises liability for injuries sustained to her foot and right shoulder while riding a bicycle on the 2500 block of Midway Drive in

28

San Diego, California.  (Dkt. No. 1-1, Not. of Removal, Am. Compl.)[1]  On October 6, 2014, the United States of America ("United States") removed the case to this Court pursuant to the Federal Tort Claims Act when Plaintiff added the Department of the Navy[2] through an amendment.  (Dkt. No. 1-1 at 2[3].)  On July 27, 2015, Plaintiff and Defendant Lockheed Martin filed a joint motion to dismiss which the Court granted on July 30, 2015.  (Dkt. Nos. 28, 29.)

According to the amended complaint, Plaintiff alleges one cause of action for premises liability as to the City of San Diego.  The United States asserts that the only cause of action against it is negligence, which Plaintiff does not dispute.[4]

On January 8, 2016, Defendant City of San Diego filed a motion for summary judgment.  (Dkt. No. 42.)  On the same day, Defendant United States of America filed a motion for summary judgment.  (Dkt. No. 43.)  Oppositions and replies were filed by both parties.  (Dkt. Nos. 67, 68, 69, 70.)

### Factual Background

On September 2, 2012, at around 4:15 p.m., Plaintiff Conni Campbell ("Plaintiff") was riding her bicycle, along with David Ellison ("Ellison"), on a dirt pathway along the north side of the 2500 block of Midway Drive in San Diego, California.  (Dkt. No. 42-5, USA's Ex. B, Campbell Depo. at 75:5-20.)  Plaintiff was riding behind Ellison on the dirt road.  (Id. at 75:6-7.)  Since the road was not paved, she was looking down near her front tire to watch for any obstacles she may hit on the

---

[1]The City states that Plaintiff filed her complaint for personal jury on August 21, 2012 against the City and Lockheed Martin Corporation.  (Dkt. No. 42-1, City's Mot. at 5.)  The original complaint is not in the Court's record.

[2]The United States of America was substituted in place of the Department of the Navy pursuant to 28 U.S.C. § 2679(a)-(b)(1).  Allen v. Veterans Admin., 749 F.2d 1386, 1388 (9th Cir. 1984).

[3]All page numbers are based on the CM/ECF pagination.

[4]"The elements of a cause of action for premises liability are the same as those for negligence: duty, breach, causation, and damages."  Castellon v. U.S. Bancorp, 220 Cal. App. 4th 994, 998 (2013) (citing Ortega v. Kmart Corpo., 26 Cal. 4th 1200, 1205 (2001)).

dirt road.  (Id. at 77:15-78:13.)  While riding on the dirt pathway, she clipped her foot on something and felt a sting.  (Id. at 75:6-7.)  Then her bike started to wobble and she ran into a fence that ran along the dirt pathway.  (Id. at 75:7-9.)  Plaintiff did not know what she hit and she told Ellison that she thought she hit her foot on a rock.  (Id. at 80:9-12.)  She saw that her second toe was cut off.  (Id. at 86:12-25.)  They went to the emergency room.  (Dkt. No. 67-23, P's Opp. to USA, Ex. 19, Campbell Depo. at 89:23-24; 90:10-15.)  She sustained injuries to her toe and right shoulder due to the fall.  (Id. at 92:7-93:10; 110:13-22.)

The next day, Plaintiff and Ellison went back to the accident site to determine what she hit.  (Dkt. No. 42-5, USA's Ex. B, Campbell Depo. at 125:15-19; Dkt. No. 42-9, USA's Ex. F, Ellison Depo. at 64:2-8.)  That is when she saw her toe on a metal stub.  (Id.)  Ellison stated that the metal stub appeared to be a "sign post base that had been jaggedly sheared off."  (Dkt. No. 42-9, USA's Ex. F, Ellison Depo. at 64:20-22.)  He also stated that he did not see any other posts in the area but he was also not looking around for anything else.  (Id. at 65:2-4; 75:7-11.)  He testified that, on the day of the accident, he did not recall seeing any metal stubs and he stated he "passed right by without seeing it."  (Id. at 90:1-14.)

The accident site is a dirt section of land between the curb line and the Navy's West Parking Lot that is enclosed by a chain link fence on the north side of the 2500 block of Midway Drive in San Diego.  The United States owns the parking lot and fence encircling the parking lot that are located along the dirt road Plaintiff was riding on.  (Dkt. No. 43-2, USA's Ex. D, Koster Depo. at 28:1-28:4; 33:3-33:8.)  There were 48 metal stubs that ran along the outside of the fence.  (Dkt. No. 42-25, City's Ex. V, McMichael Report at 3.)  The metal stub at issue was about 4.5 inches high and 3.5 inches across.  (Dkt. No. 67-27, P's Opp. to USA, Ex. 23 (photograph); Dkt. No. 67-28, P's Opp. to USA, Ex. 24 (photograph).)  Other metal stubs ranged from two to twelve inches tall.  (Dkt. No. 67-12, City's Opp to USA, Ex. 9, Garcia Depo. at 15:12-24.)  After the incident, the City's risk management made the decision to have the metal

[14cv2359-GPC(RBB) ]

stubs removed because it was a safety hazard.  (Dkt. No. 43-2, USA's Ex. E, Castillo Depo. at 12:9-13:5.)  In February 2013, city workers removed about 20 metal stubs. (Dkt. No. 67-14, P's Opp. to USA, Ex. 11, Hardy Depo. at 18:11-17; 22:6-18; Dkt. No. 67-12, City's Opp to USA, Ex. 9, Garcia Depo. at 15:1-7.)

The United States' land surveyor expert, Michael Butcher, concluded that the metal stub, at issue, is located in the right-of-way line of Midway Drive and outside the parcel owned by the United States.  (Dkt. No. 43-2, USA's Ex. F, Butcher Report at 41.)  He determined that the right-of-way for Midway Drive is an easement owned by the City for a public highway and that the underlying fee title for the property subject to the easement is vested in W. Arnet Speer and Evelyn E. Speer, husband and wife, as joint tenants.  (Id.)

The City's land surveyor expert, Patrick McMichael, concluded that the City has an 86 foot easement for public highways over Midway Drive, and concluded that the

> United States of America owns the property on the northerly side of the 2500 block of Midway Drive.  The City of San Diego's right-of-way on the northerly side of the 2500 block of Midway Drive extends between 7.1 and 7.3 feet north of the street curb toward the existing chain link fence in the 2500 block of Midway Drive at the accident site location.  The 48 cut off fence posts are generally parallel with the existing fence and right-of-way line.  The southerly edges (nearest the curb) of the cut off fence posts were found to be generally parallel to the right-of-way line and varied from 0.15 feet outside the right-of-way to 0.62 feet inside the right-of-way.  The City of San Diego has an easement for public highway over Midway Drive, but the fee ownership under midway (sic) Drive is vested in trusts for the heirs of William A. Spear.

(Dkt. No. 42-25, City's Ex. V, McMichael Report at 2-3.)  According to McMichael, the existing United States' fence is between .55 and 1.23 feet outside the right-of-way. (Id. at 2.)

Plaintiff's land surveyor expert, Michael Pallamary, primarily disputes the accuracy and reliability of the United States' and City's land surveyor experts.  (Dkt. No. 67-21, P's Opp. to USA, Ex. 17, Pallamary Report at 2-11.)  He also concluded that the property in question, based on an easement granted to the City, is owned by the

City.[5]  (Id. at 2-4.)

## Discussion

### A.      Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  Celotex Corp., 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial.  Id. at 322-23.  If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324.  If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter

---

[5]While the City objects to Pallamary's report and the underlying conclusion that the City owns the property at issue, the City does not object that it owns a right-of-way over Midway Drive which includes the dirt pathway.

of law.  Id. at 325.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party."  Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001).  All reasonable inferences must be drawn in the nonmoving party's favor, but such "inferences are limited to those upon which a reasonable jury might return a verdict."  Triton Energy Corp. v. Squire D Co., 68 F.3d 1216, 1220 (9th Cir. 1995) (citations omitted).  The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact.  Anderson, 477 U.S. at 255.

**B.     Motion for Summary Judgment as to the United States of America**

      **1.     Ownership**

In its moving papers, the government's sole argument is that it had no ownership or control over the relevant property, and therefore it is not liable.  Plaintiff opposes arguing there is a genuine issue of material fact whether the United States owned or controlled the dirt pathway.  Moreover, even if the government did not own the property, Plaintiff contends it created the dangerous condition, and is therefore liable.

The Federal Tort Claims Act ("FTCA") makes the federal government liable to the same extent as private individuals under like circumstances in accordance with California law.  28 U.S.C. § 2674.  "The elements of a cause of action for premises liability are the same as those for negligence: duty, breach, causation, and damages." Castellon v. U.S. Bancorp, 220 Cal. App. 4th 994, 998 (2013) (citing Ortega v. Kmart Corpo., 26 Cal. 4th 1200, 1205 (2001)).  "A defendant cannot be held liable for the defective or dangerous condition of property which it did not own, possess, or control. Where the absence of ownership, possession, or control has been unequivocally established, summary judgment is proper."  Isaacs v. Huntington Mem. Hosp., 38 Cal. 3d 112, 134 (1985).

The United States does not dispute that it owns the parcel of land on the 2500[6] block of Midway Drive which includes the parking lot and the fence encircling the parking lot. (Dkt. No. 43-2, USA's Ex. D, Koster Depo. at 28:1-4; 33:3-33:8.) The metal stub is located outside of the fence and located on a dirt pathway, that is not owned by the United States. (Dkt. No. 43-2, USA's Ex. C, photograph.) Commander Chad Koster, the Public Works Officer for the Naval Base Point Loma and the Person Most Qualified ("PMK") on behalf of the United States of America, testified that he does not know who owns the dirt pathway between the parking lot fence and curb and the government does not conduct any inspections along the dirt road. (Dkt. No. 43-2, USA's Ex. D, Koster Depo. at 36:2-15.) Butcher, the government's land surveyor expert, concluded that the metal stub is located outside of the parcel owned by the United States and within the right-of-way for Midway Drive. (Dkt. No. 43-2, USA's Ex. F, Butcher Report at 41.) According to Butcher's investigation, the underlying fee title of the dirt pathway is vested in W. Arnet Speer and Evelyn E. Speer, husband and wife, as joint tenants. (Id.) In addition, the United States asserts that it did not control over the property and conducted no inspections over the property. (Dkt. No. 43-3, USA's Ex. D., Koster Depo. at 42:9-42:12.)

In opposition Plaintiff asserts that Blair Lane MacKenzie, the City's PMK regarding ownership of City property testified that "the property owned to the northeast of this line is owned by the United States" and the parcel of land "bordered by Midway Drive and Enterprise is owned by the United States of America." (Dkt. No. 67-6, P's Opp. to USA, Ex. 3, MacKenzie Depo. at 30:8-15, 33:3-9; Dkt. No. 67-8, P's Opp. to USA, Ex. 5, MacKenzie Depo. Ex. 4; Dkt. No. 67-9, P's Opp. to USA, Ex. 6, MacKenzie Depo. Ex. 6.) Plaintiff also argues that the United States has not determined ownership of the dirt path and that the United States failed to provide any

---

[6]The United States' briefs refers to 2400 block of Midway Drive. (Dkt. No. 43-1.) The Court assumes it is a typographical error as the United States has not disputed Plaintiff's allegation that her injury accident happened on the 2500 block of Midway Drive. (Dkt. No. 1-1, Not. of Removal, Compl.)

[14cv2359-GPC(RBB)]

evidence that the property it took when the land was condemned is exactly the same as the fence boundary.   However, the Court concludes it is Plaintiff's burden to demonstrate the elements of premises liability including ownership of the property, and has the burden, on summary judgment, to point to specific facts demonstrating that there is a genuine issue of fact for trial.   Plaintiff has not presented any facts to demonstrate that the United States owns the dirt pathway.

The Court concludes that there is no genuine issue of material fact that the United States does not own the dirt pathway along the fence encircling the West Parking Lot.   MacKenzie's conclusion concerning what property is owned by the United States does not demonstrate that the United States specifically owns the dirt pathway at issue.   MacKenzie provided a general statement that "the property owned to the northeast of this line is owned by the United States" and the parcel of land "bordered by Midway Drive and Enterprise is owned by the United States of America." (Dkt. No. 67-6, P's Opp. to USA, Ex. 3, MacKenzie Depo. at 30:8-15; 33:3-9.)  He was uncertain whether the City's right-of way along Midway Drive included the dirt pathway and was unable to identify what rights the City's right-of-way along Midway Drive included.   (Dkt. No. 42-14, City's Ex. K, MacKenzie Depo. at 20:11-21:12; 23:20-23.)

As the United States points out, the evidence demonstrates that the metal stub, at issue, is outside of the parcel owned by the United States, and no expert has concluded that the metal stub is within the parcel owned by the United States.   The government's land surveyor concluded that the metal stub is located outside the parcel owned by the United States.   (Dkt. No. 43-2, USA's Ex. F, Butcher Report at 41.)  The City's land surveyor did not conclude that the United States owns the property where the metal stub was located and merely asserts general conclusions that the "United States of America owns the property on the northerly side of the 2500 block of Midway Drive."   (Dkt. No. 43-2, USA's Ex. G, McMichael Report at 53-55.)  Plaintiff's land surveyor expert did not conduct his own analysis as to the location of the metal stub;

[14cv2359-GPC(RBB) ]

however his report concluded the City was granted an easement for a public highway over Midway Drive, which includes the dirt pathway at issue.  (Dkt. No. 67-21, P's Opp. to USA, Ex.17, Pallamary Report at 2-11.)

Based on Plaintiff's failure to present evidence to dispute Defendant's facts as to the location of the metal stub, the Court concludes that Plaintiff has not demonstrated a triable issue of fact on whether the United States owns the dirt pathway where the metal stub at issue is located.[7]

## 2.    Control

The United States also argues that it did not exercise control over or conduct any inspections of the dirt pathway.  Plaintiff maintains that there is a genuine issue of fact whether the United States controls and maintains the dirt path.  According to Plaintiff, a jury could reasonably infer that the United States maintains the dirt path outside the fence on the west side of the West Parking Lot since it retained a contractor to cut the weeds along the fence.  In looking at the photographs of the area, a contractor would have to cut the weeds outside the fence to create a clear sight line based on Navy policy to establish a clear zone.[8]  Since the fence has been around the West Parking Lot for decades, someone must have maintained the dirt path or else the dirt pathway would have been overgrown with weeds and brush.

According to Koster, the United States did not conduct any inspections of the dirt pathway; it was only responsible for maintenance of the West Parking Lot and the fence.  (Dkt. No. 43-2, USA's Ex. D, Koster Depo. at 28:13-16; 33:8-15; 42:9-42:12.)

---

[7]Plaintiff also argues that the government had constructive notice of the dirt path's dangerous condition because had it conducted inspections, it would have noticed at least one of the 48 jagged, rusty, metal stubs within the parking lot near the fence.  Since the Court concludes that the United States did not own the property underlying the metal post at issue, the Court need not address whether the government had constructive notice of the dirt path's dangerous condition.

[8]Mugg testified that the government's security policy as to the height of weeds is called the "clear zone" where weeds must be cut, inside of security fences, so that it can clearly see if somebody is doing something to the fence. (Dkt. No. 67-14, P's Opp. to USA, Ex. 12, Mugg Depo. at 57:20-58:17.)  Mugg also testified that the West Parking Lot is lightly patrolled.  (Id. at 58:11-12.)

From March to September 2012, the Navy contracted with Chugach to cut the weeds inside the fence in the West Parking Lot. (Dkt. No. 70-1, P's Reply Ex. I, Mugg Depo. at 50:14-50:24; 54:3-54:21.) The United States does not maintain the land outside the fence. (See id.) According to Plaintiff, Chugach testified that it never cut the weeds near the fence on the west side of the West Parking Lot. (Dkt. No. 67, P's Opp. to USA at 8.)

In opposition, Plaintiff does not present any facts to dispute the government's facts; but only argues that based on the government's facts, a trier of fact could reasonably conclude that the United States maintains the dirt path outside the fence since it retained a contractor to cut the weeds along the fence, and based on the Navy's policy of establishing a clear zone inside its fences.

Fist, the Court concludes that Plaintiff's argument that the United States maintained the dirt path along the outside of its fence is not a reasonable inference based on the evidence presented. Moreover, even if the United States conducted maintenance, "simple maintenance of an adjoining strip of land owned by another does not constitute an exercise of control over that property." Contreras v. Anderson, 59 Cal. App. 4th 188, 198 (1997). While evidence of maintenance is "relevant on the issue of control," the California Supreme Court limited its holding by stating that "the simple act of mowing a lawn on adjacent property (or otherwise performing minimal, neighborly maintenance of property owned by another) generally will [not], standing alone, constitute an exercise of control over property and give rise to a duty to protect or warn persons entering the property." Alcaraz v. Vece, 14 Cal. 4th 1149, 1167 (1997). In Alcaraz, the defendants not only maintained the adjacent lawn owned by the city but also constructed a fence enclosing this narrow strip of land after the plaintiff's alleged injury. Id. at p. 1154. The court considered the constructed fence "highly relevant" because "[i]t is obvious that the act of enclosing property with a fence constitutes an exercise of control over that property." Id. at 1167. The court concluded that the evidence went beyond simple neighborly maintenance and, thus, was sufficient

1  to raise a triable issue of fact as to control.  Id. at 1170.

2      Here, the act of simple maintenance, allegedly cutting weeds along the outside

3  of the fence, does not rise to the level of control subject to a legal duty to warn or

4  protect.  Plaintiff has not raised a genuine issue of material fact as to whether the

5  United States conducted maintenance that amounts to an exercise of control over the

6  dirt pathway.

7      **3.**    **Creation of Dangerous Condition**

8      Lastly, the United States asserts it did not create the dangerous condition at issue

9  and any witnesses' suggestion that the posts are remnants of a sign post or fence is not

10  credible evidence and mere speculation to establish that the United States placed it

11  there. Plaintiff opposes arguing that the United States created the dangerous condition,

12  even if it does not own the land.  Plaintiff contends that the facts create an inference

13  that metal stub was the remnant of an earlier fence that lined the parking lot based on

14  the fact that were 48 metal post stubs that were roughly parallel with the existing fence

15  and straddle the Naval Base's boundary line.

16      In general, in the absence of a statute, a landowner has no duty to maintain a

17  public street abutting upon his property in a safe condition.  Sexton v. Brooks, 39 Cal.

18  2d 153, 157 (1952).  An exception to the general rule is that an "abutting owner is

19  liable for the condition of portions of the public sidewalk which he has altered or

20  constructed for the benefit of his property and which serve a use independent of and

21  apart from the ordinary and accustomed use for which sidewalks are designed." Id.

22  A "property owner cannot avoid liability on the ground that the condition was created

23  by his predecessors in title." Id.  Under this exception, the court looks at whether the

24  alteration serves a use independent and apart from the ordinary and accustomed use of

25  the sidewalk, the degree of exclusivity, and whether the abutting owner derives a

26  benefit from the alteration.  Contreras, 59 Cal. App. 4th at 202.  It is well settled that

27          if the abutting owner by positive action creates a condition which is
        likely to cause harm to persons lawfully using the sidewalk, and a

28          person is injured as a proximate result thereof, the property owner is
        liable.  Stated another way, the owner of premises abutting a sidewalk

is under a duty to refrain from doing any affirmative act that would render the sidewalk dangerous for public travel.

Barton v Capitol Market, 57 Cal. App. 2d 516, 518 (1943) (judgment of nonsuit not proper where personal injury sustained from a fall on a slippery sidewalk bordering defendant's business and there was evidence that some substance was sprayed on defendant's building which ran down the building and across the sidewalk causing it to be oily, greasy and slippery when wet).

Here, there were 48 metal stubs that ran parallel to the existing fence. (Dkt. No. 42-25, City's Ex. V, McMichael Report at 3.) City employee Garcia testified that he saw at least one metal stub inside the fence. (Dkt. No. 67-12, P's Opp. to USA, Ex. 9, Garcia Depo. at 23:21-24:7.) City employees Garcia and Hardy, who removed the metal stubs after the accident, both surmised that based on the configuration of the metal stubs, it was previously a fence. (Dkt. No. 67-12, P's Opp. to USA, Ex. 9, Garcia Depo. at 20:20-21:7; Dkt. No. 67-14, P's Opp. to USA, Ex. 11, Hardy Depo. at 22:19-23:12.) Moreover, Hardy had experience working with the City's fence crew and noted that the post stubs did not resemble street signs that are used by the City. (Dkt. No. 67-14, P's Opp. to USA, Ex. 11, Hardy Depo. at 23:13-21; 36:20-37:24.) Furthermore, even Mugg, the Deputy Public Works Officer for Naval Base Point Loma, and also a licensed engineer, testified that there was regular spacing of the metal stubs and that they were most likely fence posts. (Dkt. No. 67-15, P's Opp. to USA, Ex. 12, Mugg Depo. at 70:5-72:24; Dkt. No. 70-1, P's Reply Ex. I, Mugg Depo. at 7:5-13 .) Koster testified that the United States would be the only entity to erect a fence around the West Parking Lot. (Dkt. No. 67-10, P's Opp. to USA, Ex. 7, Koster Depo. at 32:12-24.) Mugg also stated that while the Navy has allowed others to build a fence within 1 to 2 feet of United States' property, he did not know of anyone other than the Navy to have installed a fence along the West Parking Lot. (Dkt. No. 70-1, USA's Reply Ex. I, Mugg Depo. at 84:3-22.) Therefore, these facts create a reasonable inference that the 48 metal stubs, including the one Plaintiff hit, were previously a fence erected by the

1  United States and subsequently removed with the metal stubs of the fence remaining.[9]

2  Moreover, it is reasonable to infer that the previous fence served the Navy for an

3  exclusive use separate from the use of the dirt pathway and the United States derived

4  a benefit from the previous fence.  See Contreras, 59 Cal. App. 4th at 202.

5      In viewing all reasonable inference in favor of Plaintiff, the Court DENIES

6  Defendant United States' motion for summary judgment on the issue of whether it

7  created the dangerous condition.  See Triton Energy Corp., 68 F.3d at 1220.

8  **C.  Motion for Summary Judgment as to the City of San Diego**

9      As a threshold issue, Defendant City argues it does not own, lease, occupy,

10  control or maintain the dirt pathway; therefore, it is not liable.  It contends that the

11  property owner is responsible to care and maintain its land which, according to its

12  expert, is the United States and the heirs of W. Arnet Speer and Evelyn E. Speer.  The

13  City does not dispute that it has an easement/right-of-way for "public highways" and

14  "utilities, regulatory signs" on the dirt pathway.[10]  Plaintiff responds that the City of

15  San Diego owns the right-of-way on the dirt path, which establishes ownership of the

16  dirt path.

17      The California Tort Claims Act provides that a public entity is liable only if

18

19

20

_____

21      [9]The United States responds that Plaintiff impermissibly attempts to offer

22  conclusory statements by percipient witnesses as expert opinions regarding the
    possibility that the metal stub is a remnant of a fence post.  The Court disagrees.

23  Whether these 48 metal stubs were remnants of a prior fence does not require
    specialized knowledge, training or experience.

24      [10]Plaintiff disputes the City's characterization of the right-of-way as an easement

25  in its separate statement of undisputed material facts, although in the City's brief it uses
    easement and right-of-way interchangeably. (Dkt. No. 68-1 at 4.)  Plaintiff asserts that

26  the City has a "right-of-way", not an easement as testified by MacKenzie, the City's
    PMK. (Id.) However, the Court notes that the deposition pages cited in support are not

27  contained in the record.  Second, a review of MacKenzie's deposition presented by
    both parties does not reveal that MacKenzie testified that the City did not have any

28  easements in this area.  Lastly, to support her argument, Plaintiff has not legally
    differentiated between an easement and a right-of-way, or the significance of the two
    terms, if any.  The Court finds Plaintiff's objection without merit.

provided by statute. Cal. Gov't Code § 815.[11]  Section 835 makes a public entity liable for the following:

> Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Cal. Gov't Code § 835. Plaintiff has the burden to prove all elements under section 835. Drummond v. City of Redondo Beach, 255 Cal. App. 2d 715, 719 (1967). The City moves for summary judgment on whether it owned, leased, occupied, controlled or maintained the property underlying the metal stub at issue, whether it was a dangerous condition, and whether the City had actual or constructive notice.

### 1. Ownership or Control of the Dirt Path

California Civil Code sections 801 and 802 describe types of easements to include a "right-of-way" which may be conveyed but not attached to land. Cal. Civ. Code §§ 801, 802. An "easement is an interest in the land of another, which entitles the owner of the easement to a limited use or enjoyment of the other's land." Mamola v. State of California ex rel. Dept. of Transp., 94 Cal. App. 3d 781, 787-88 (1979) (emphasis in original) (citation omitted). "A right of way is primarily a privilege to

---

[11]
Except as otherwise provided by statute:
(a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.
(b) The liability of a public entity established by this part (commencing with Section 814) is subject to any immunity of the public entity provided by statute, including this part, and is subject to any defenses that would be available to the public entity if it were a private person.

Cal. Gov't Code § 815.

pass over another's land.  It does not exist as a natural right, but must be created by a grant or by its equivalent.  Such rights of way may be either public or private." Alameda Cty. v. Ross, 32 Cal. App. 2d 135, 143 (1939).  "Ordinarily, the owner of the servient tenement[12] is under no duty to maintain or repair the easement."  Herzog v. Grosso, 41 Cal. 2d 219, 228 (1953).  "It is the duty of the owners of an easement to keep it in repair."  Crease v. Jarrell, 65 Cal. App. 554, 559 (1924).[13]

While the City argues that it does not own, lease, occupy, control or maintain the dirt path, it does not dispute that it owns a right-of-way over Midway Drive.  The City asserts that because it only has a right-of-way for utilities, regulatory signs and for a public highway, it is not obligated to maintain the right-of-way.  In response, Plaintiff asserts that the City owns the dirt path by owning the right-of-way. (Dkt. No. 68-9, P's Opp. to City, Ex. 6, Pallamary Report at 2-4.)  Plaintiff further asserts that a trier of fact could reasonably infer that the City exercised "control" over its right-of-way.  (Dkt. No., Ex. 12, MacKenzie Depo. at 44:11-24.)  Lastly, after the accident, the City cut the down the stubs without notice or permission from anyone, which demonstrates control over the dirt pathway.

Under section 835, "property of a public entity" means "real or personal property owned or controlled by the public entity, but do not include easements, encroachments and other property that are located on the property of the public entity but are not owned or controlled by the public entity."  Cal. Gov't Code § 830(c).  According to the "Law Revision Commission Comment" following section 830, the exclusion of easements, encroachments and similar property from the meaning of "property of a public entity" "is based on the theory that it is the duty of the person or entity that owns

---

[12]"The land to which an easement is attached is called the dominant tenement; the land upon which a burden or servitude is laid is called the servient tenement."  Cal. Civil Code § 803.  Therefore, the underlying land is the servient tenement.  Wright v. Best, 19 Cal. 2d 368, 381 (1942) (an appurtenant easement involves two tenements - "a dominant one in favor of which the obligation exists, and a servient one upon which the obligation rests.")

[13]The Court notes that neither party has addressed the significance of a right-of-way or easement as to ownership and control.

[14cv2359-GPC(RBB)]

the easement, encroachment or similar property to inspect such property for hazards, rather than being the duty of the owner of the servient estate." Holmes v. City of Oakland, 260 Cal. App. 2d 378, 385 (1968) (citing Law Revision Commission Comment).  Contrary to the City's position, this provision contemplates that owners of easements exercise some measure of control over the property.

In addition, courts have held that ownership alone does not create liability for a public entity.  Tolan v. State of Cal. ex rel. Dept. of Transp., 100 F.3d 980, 984 (1979); Low v. City of Sacramento, 7 Cal. App. 3d 826, 831 (1970).  For liability to be imposed on a public entity for a dangerous condition of property, the entity must be in a position to protect against or warn of the hazard.  Cal. Gov. Code § 835(b). Therefore, the crucial element is control, not ownership.  Low, 7 Cal. App. 3d at 831; Mamola, 94 Cal. App. 3d at 788.  In Low, the court of appeal stated, "[w]here the public entity's relationship to the dangerous property is not clear, aid may be sought by inquiring whether the particular defendant had control, in the sense of power to prevent, remedy or guard against the dangerous condition; whether his ownership is a naked title or whether it is coupled with control; and whether a private defendant, having a similar relationship to the property, would be responsible for its safe condition."  Low, 7 Cal. App. 3d at 833-834.

In Low, the plaintiff sustained injuries when she fell into a water-filled depression in a parking strip outside a hospital owned and operated by the county.  Id. at 829.  The Supreme Court affirmed the trial court's ruling as a matter of law that the parking strip was owned by the city and controlled by the county.  The California Supreme Court noted that the City, as holder of the street easement, and the county, as holder of the underlying fee both had a "species of ownership" and control.  Id. at 834. The county, as the holder of the underlying fee, and the abutting owner, was held to have control when it undertook to maintain the grassy surface of the parking strip, it permitted the parking strip to deteriorate and it had the power to prevent or fix the danger.  Id.  The court further explained that the city bears liability because since the

[14cv2359-GPC(RBB) ]

parking strip lies within the street right of way, "the public easement enables the city to control it in the interest of public safety." Id. at 833.

Here, according to the City's expert, the City has an 86 foot right of way along Midway Drive where 68.80 to 69.32 foot are paved. (Dkt. No. 42-25, City's Ex. V, McMichael Report at 3.)  The right-of-way on the north side of Midway Drive is between 7.1 to 7.3 feet from the face of the curb toward the fence which is owned by the United States. (Id.)  It appears that the right-of-way includes the property where the metal stub was located.  The City admits it has jurisdiction over the right of way designation along Midway Drive for utilities, regulatory signs and for public highways. In addition, the fact that, after the accident, the City cut down the metal stubs without having to obtain permission is circumstantial evidence that the City was in a position to protect against or warn of the hazard.  See Cal. Gov. Code § 835(b); Alcaraz, 14 Cal. 4th at 1167-68 (the fact that the defendant created a fence around the dangerous condition after the accident constitutes circumstantial evidence that the defendant also exercised possession and control over the property at the time the plaintiff was injured).

Besides a conclusory argument that the City does not own, possess or control the property at issue, the City does not provide any legal support that an easement or right-of-way does not establish a level of control over the easement or right-of-way.  Based on the evidence presented, the Court concludes that there is a genuine issue of material fact as to whether the City, as owner of the right-of-way, had control over the dirt pathway.

### 2.    Dangerous Condition

The City argues that since it did not own, lease, occupy, control or maintain the accident site, and did not create the dangerous condition, Plaintiff cannot establish the existence of any dangerous condition of public property.  Plaintiff asserts that there is no real dispute that the "jagged, rusty, metal stubs created a dangerous condition." (Dkt. No. 68 at 12.)

A "dangerous condition" is "a condition of property that creates a substantial .

[14cv2359-GPC(RBB)]

. . risk of injury when such property or adjacent property is used with due care" in a "reasonably foreseeable" manner. Cal. Gov't Code § 830(a). The existence of a dangerous condition is ordinarily a question of fact but it can be decided as a matter of law if reasonable minds can come to only one conclusion. <u>Zelig v. County of Los Angeles</u>, 27 Cal. 4th 1112, 1133 (2002).

Plaintiff presents the following facts. Commander Koster stated that the metal stubs were dangerous. (Dkt. No. 68-6, P's Opp. to City, Ex. 3, Koster Depo. at 42:19-43:13.) Joe Castillo, the City's Public Works Superintendent, testified that the metal stubs were a hazard. (Dkt. No. 68-4, P's Opp. to City, Ex. 1, Castillo Depo. at 13:3-5; 14:16-21; 15:3-9; 24:2-7.) City employee Robert Hardy stated that the metal stubs were dangerous. (Dkt. No. 68-11, P's Opp. to City, Ex. 8, Hardo Depo. at 18:11-20:2.) Plaintiff's engineer expert opined that the metal stubs were dangerous. (Dkt. No. 68-13, P's Opp. To City, Ex. 10, Avrit Report at 4.)

The City does not address, and it does not appear to dispute that the metal stub created a dangerous condition. Accordingly, the Court DENIES Defendant's motion for summary judgment as to whether there was a dangerous condition.

**3.     Actual or Constructive Notice of the Dangerous Condition**

While the City contends that Plaintiff has not demonstrated that the City had actual notice of the dangerous condition of the property, Plaintiff does not address or oppose the City's argument that it did not have actual notice. Instead, Plaintiff opposes arguing that the City had constructive notice.

As to constructive notice, the City argues that it did not have constructive notice of the dangerous condition because the jagged or broken metal post stub was not visually obvious and there is no evidence how long the metal post stub had been there prior to the accident. Plaintiff disputes these allegations and contends that the City exercised control and had constructive notice of the unreasonably dangerous condition because it existed for at least five years before the accident and the City had no inspection policy that would have alerted them to the dangerous condition.

California Government Code section 835.2 provides that

(a) A public entity had actual notice of a dangerous condition within the meaning of subdivision (b) of Section 835 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character.

(b) A public entity had constructive notice of a dangerous condition within the meaning of subdivision (b) of Section 835 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. On the issue of due care, admissible evidence includes but is not limited to evidence as to:

(1) Whether the existence of the condition and its dangerous character would have been discovered by an inspection system that was reasonably adequate (considering the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger to which failure to inspect would give rise) to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property.

(2) Whether the public entity maintained and operated such an inspection system with due care and did not discover the condition.

Cal. Gov't Code § 835.2.   The threshold elements to determine if the City had constructive notice is "[w]hether the dangerous condition was obvious and whether it existed for a sufficient period of time." Heskel v. City of San Diego, 227 Cal. App. 4th 313, 317 (2014).   In Heskel, the court of appeals affirmed the trial court's grant of summary judgment in favor of the City because there was sufficient evidence that the dangerous condition was not obvious.   Id.   In Heskel, the plaintiff suffered injuries when he tripped over a "protruding base of a hollow metal post . . . cemented into a city sidewalk." Id. at 315.   The evidence demonstrated that the condition existed for more than one year prior to the incident but the evidence did not substantiate the dangerous condition was obvious.   Id. at 320-21.   The plaintiff presented evidence that the condition was above ground and visible but did not show that "it was of a substantial size or so visible from public thoroughfares that the City, in the exercise of due care, should have become aware of it and then corrective action to cure it." Id. at 321. Constructive "knowledge may be shown by circumstantial evidence 'which is nothing

1  more than one or more inferences which may be said to arise reasonably from a series

2  of proven facts.'" Ortega v. Kmart Corp., 26 Cal.4th 1200, 1205 (2001) (citation

3  omitted).

### i.    Length of Time Dangerous Condition Existed

5        The City argues that Plaintiff has not presented any evidence how long the metal

6  post stub was present prior to the accident or even how it came to be present at the

7  accident site or who created it.  In addition, it argues that Plaintiff's argument that the

8  existing fence has been in place since at least 2007 does not shed light on how long the

9  metal stubs have been there.  In opposition, Plaintiff argues that although the exact

10  length of time the metal stubs have existed is not known, they have likely been there

11  for many years based on the length of time the existing fence has been around.

12        "It is well settled that constructive notice can be shown by the long continued

13  existence of the dangerous or defective condition, and it is a question of fact for the

14  jury to determine whether the condition complained of has existed for a sufficient time

15  to give the public agency constructive notice." Erfurt v. State of California, 141 Cal.

16  App. 3d 837, 844-45 (1983); Ortega, 26 Cal.4th at 1207 ("Whether a dangerous

17  condition has existed long enough for a reasonably prudent person to have discovered

18  it is a question of fact for the jury, and the cases do not impose exact time limitations.

19  Each accident must be viewed in light of its own unique circumstances.")  In addition,

20  "[c]onstructive notice of a particular defect may be aided by the existence of other

21  defects in the same area." Clark v. City of Berkeley, 143 Cal. App. 2d 11, 15 (1956).

22  In Clark, the court of appeal reversed the trial court's judgment of nonsuit in favor of

23  the defendant holding that the issue whether the dangerous condition was obvious was

24  a jury question. Id. at 14-16 ("An isolated minor defect may be so trivial, that though

25  it creates a peril to pedestrians using it, the city as a matter of public policy may not be

26  held liable to repair it. An entire sidewalk crumbling and falling apart is an entirely

27  different matter and the city should not be entitled to ignore the cumulative perils

28  presented by its generally fragmented condition.")

Plaintiff argues that the metal stubs have been there since at least 2007, and likely as far back as 1997 or earlier.[14]  Walter Buechele, a longtime employee of Lockheed Martin for about twenty-five years testified that during 1993 and 2001, he would walk down the dirt path to go to lunch.  (Dkt. No. 68-14, P's Opp. to City, Ex. 11, Buechele Depo. at 12:8-13; 53:24-54:8.)  He commented that the prior fence was very old with different coloring, and different weaves.  (Id. at 54:16-55:3; 56:3-17.)  When shown the picture of the current fence, he stated that the current fence was in fairly good condition and did not look like the same fence he had seen earlier.  (Id. at 58:2-8.)

Commander Koster, the Public Works Officer for the Naval Base Point Loma responsible for all construction and maintenance at the base, testified that the United States does not know when the current fence was built and there are no records that relate to it.  (Dkt. No. 68-6, P's Opp. to City, Ex. 3, Koster Depo. at 31:9-32:4.)[15]  Koster testified that no entries in the United States' databases were located as to when the fence was constructed.  (Id. at 31:15-22.)  The Navy's Maximo database, which involves "managing requests" and "requirements" has been in use since at least 1997 when Koster used it in Arizona.  (Id. at 74:24-75:13.)  The E-Contracts database manages contract files and Koster did not know how long the government has used that database.  (Dkt. No. 68-6, P's Opp. to City, Ex. 3, Koster Depo. at 76:17-20.)

The Court concludes that Plaintiff has raised a reasonable inference, when

---

[14] Plaintiff presents the expert report of civil engineer, Brad Avrit, where he states that the post stubs have existed in the area since at least 2007 based on historical street view images. (Dkt. No. 68-13, P's Opp. to City, Ex. 10, Avril Report at 5.) The City objects because Avrit has not presented the historical street view images he relied on.  The Court agrees with the City's objections.  Avrit's conclusion about the existence of the current fence is not supported by the record before the Court.

[15] Plaintiff also states that the current fence existed when Mr. Mugg began his assignment in August 2008. (Dkt. No. 68-6, Ex. 5; Mugg Depo: 17:11-25.) However, the deposition transcript does not state this proposition. Moreover, Koster testified that the fence has been around the West Parking Lot since he's been in San Diego, (Dkt. No. 68-6, P's Opp. to City, Ex. 3, Koster Depo. at 32:1-4); however, the transcript does not indicate how long Koster has been in San Diego.  These deposition transcripts are not supportive of Plaintiff's argument.

viewed in the light most favorable to her, to raise a genuine issue of material fact whether the dangerous condition had existed long enough for a reasonable prudent person to have discovered the metal stub.[16]  See Ortega, 265 Cal. 4th at 1206-07.

### ii.    Whether the Dangerous Condition Was Obvious

The City argues that the facts in this case are akin to Heskel where the court of appeals held that the condition of a protruding base of a hollow metal post cemented into a city sidewalk was not obvious.  Plaintiff maintains that the facts in Heskel are distinguishable because in that case there was only one post hidden by grass and weeds and there was no evidence whether the defendant had an inspection policy.

"It is well settled that a city will be charged with constructive notice of substantial defects in the public sidewalk which have existed for such a length of time and are of such a conspicuous character that a reasonable inspection would have disclosed them."  Clark, 143 Cal. App. 2d at 14-15.  The Court looks at whether a reasonable person, exercising due care, could see the dangerous condition.  See Cal. Gov't Code § 835.2; Curreri v. City and County of San Francisco, 262 Cal. App. 2d 603, 613-14 (1968); Ferdette v. City of Long Beach, 187 Cal. App. 3d 122, 132 (1986) (danger was obvious to anyone using the pier).  Whether the dangerous condition could have been discovered by reasonable inspection is a question for the jury.  Stanford v. City of Ontario, 6 Cal. 3d 870, 884 (1972); Erfurt, 141 Cal. App. 3d at 845 ("[w]hether the dangerous condition should have been discovered by reasonable inspection and whether there is adequate time for preventive measures is properly left to the jury.").

The City provides the following facts to support its position that the metal stub was not obvious.  Plaintiff and her husband, David Ellison did not see the metal stub on the day of the accident.  (Dkt. No. 42-5, City's Ex. B, Campbell Depo. at 79:4-25; 80:1-14; 125:14-25; 203:2-22; Dkt. No. 42-9, City's Ex. F, Ellison Depo. at 43:7-16;

---

[16]As discussed earlier on the United States' motion for summary judgment, the Court concluded there is a genuine issue of material fact whether the United States created the dangerous condition since the 48 metal stubs could be remnants of a prior fence that encircled the West Parking Lot.  Therefore, the existence of the current fence is relevant to determining how long the metal stubs have been there.

65:2-6; 75:2-14; 90:1-14.)  City employees Manuel Garcia and Robert Hardy could not see the metal fence post stubs from the street and had to get out of their vehicle, walk around and then noticed the metal stubs.  (Dkt. No. 42-18, City's Ex. O, Garcia Depo. at 15:9-25; 16:1-24.)  In addition, according to the City, since the accident site is not owned, leased, occupied, maintained or controlled by the City, it would not be an area where the City would perform routine inspections.  Moreover, no complaint was ever made to the City about the metal post stubs prior to the accident, and therefore it had no reason to inspect the dirt pathway. Defendant argues that the metal stub was not something that it could have observed from a public thoroughfare and therefore it was not obvious.

Plaintiff presents evidence that the City had no policy of inspection designed to discover safety hazards on Midway and/or on or adjacent to San Diego city streets. (Dkt. No. 68-4, P's Opp. to City, Ex. 1, Castillo Depo. at 8:25-9:16 (as to Midway Drive); Dkt. No. 68-10, P's Opp. to City, Ex. 7, Garcia Depo. 25:9-26:15 (as to city streets and Midway Drive); Dkt. No. 68-11, P's Opp. to City, Ex. 8, Hardy Depo. at 8:17-25 (as to city streets).)  The City admits that it does not maintain the area since the area is not owned, leased, occupied or controlled by the City.  (Dkt. No. 42-1, City's Mot. at 19.)

In this case, there were 48 stubs that ran along the dirt pathway that ranged in height from 2 to 12 inches.  City worker Garcia testified that had he seen the stubs, he would have reported them as a safety hazard.  (Dkt. No. 68-10, P's Opp. to City, Ex. 7, Garcia Depo. at 38:15-39:24.)  The City's argument that no complaints were made or it had no reason to inspect the dirt pathway does not address whether a reasonable inspection would have revealed the dangerous condition to the City.  Moreover, the City asserts that obviousness is based on whether one could see the metal stubs from the street, not whether a reasonable person exercising due care in riding a bike on the dirt path would have noted that the metal stub was obvious.  Therefore, the Court concludes that whether a reasonable inspection policy would have resulted in the

[14cv2359-GPC(RBB) ]

1  discovery of the dangerous condition is a triable issue of fact.  Accordingly, the Court

2  DENIES the City's motion for summary judgment.[17]

3  **D.     Plaintiff's Evidentiary Objections**

4       Plaintiff filed evidentiary objections[18] to evidence submitted by the City in

5  support of its motion for summary judgment which the City opposed.  (Dkt. Nos. 68-2;

6  69-1.)  The City also filed objections to the declaration of Michael Pallamary and Brad

7  Avrit filed in support of Plaintiff's opposition.  (Dkt. Nos. 69-2, 69-3.)  The Court

8  notes the objections.  To the extent that the evidence is proper under the Federal Rules

9  of Evidence, the Court considered the evidence.  To the extent that the evidence is not

10 proper, the Court did not consider it.

**Conclusion**

12      Based on the above, the Court DENIES Defendant City of San Diego's motion

13 for summary judgment on the claim of premises liability, and DENIES Defendant

14 United States of America's motion for summary judgment on the issue of whether it

15 created the dangerous condition.  The hearing date set for February 5, 2016 shall be

16 **vacated.**

17      IT IS SO ORDERED.

18 DATED:  February 3, 2016

19

20                                    HON. GONZALO P. CURIEL
                                      United States District Judge

21

---

22  [17]The City also argues that there is no evidence that a city employee or contractor created the condition, (Dkt. No. 42-1 at 20-22), and that Cal. Civil Code section 846's

23 "willful failure to warn" does not apply to public entities.  Plaintiff does not address these arguments in her opposition and it appears these are not allegations she intends

24 to pursue.

25  [18]Plaintiff's objects to the declarations of Tom Landre, Marta Terrell, Scott

26 Chadwick, Caryn Hosford, Isam Hireish and Charlie Hopper because they were not disclosed in the City's Federal Rule of Civil Procedure 26 disclosure and should be

27 excluded pursuant to Rule 37(c)(1).  The City argues and Court agrees that Plaintiff's citation to these witnesses was for purposes of demonstrating that the City did not have

28 actual notice of the alleged dangerous condition.  Since Plaintiff did not dispute whether the City had actual notice, the Court did not need to consider these
   declarations and the objections are moot.

[14cv2359-GPC(RBB) ]