# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONNI CAMPBELL, an individual, | Case No.: 14cv2359 GPC (RBB) |
| Plaintiff, | **ORDER AWARDING DAMAGES FOLLOWING REMAND** |
| v. | |
| LOCKHEED MARTIN CORPORATION, THE CITY OF SAN DIEGO, THE UNITED STATES OF AMERICA, and DOES 1-50, | |
| Defendants. | |

The Ninth Circuit has reversed the Court's order issuing judgment in favor of Defendant and remanded solely to determine the appropriate damage award on Plaintiff's claim of negligence/premises liability. Before the Court is the amount of damages Plaintiff should be awarded after she sustained injuries when she clipped the top of her right second toe on a metal stub while riding a bicycle next to government property. The issue of damages is fully briefed. (Dkt. Nos. 175, 176, 184.) Having considered the parties' briefing, the trial record, and the applicable law, the Court AWARDS Plaintiff non-

economic damages in the amount of $235,000.

## Procedural Background

Plaintiff Conni Campbell ("Plaintiff") brought this action against Defendant United States of America ("Defendant" or "government") for injuries sustained when she clipped the top of her toe on a metal stub while riding a bicycle on a dirt pathway along the north side of the 2500 block of Midway Drive in San Diego, California.[1] Plaintiff alleged negligence/premises liability[2] against the government. The Court held a bench trial on June 6-8, 2016. (Dkt. Nos. 142, 143, 147.) On December 1, 2016, the Court issued a Memorandum Decision Following Trial and Order for Entry of Judgment. (Dkt. No. 158.) Judgment was entered in favor of Defendant and against Plaintiff. (Dkt. No. 159.)

On January 24, 2017, Plaintiff filed a notice of appeal of the Court's ruling. (Dkt. No. 163.) On July 25, 2018, the Ninth Circuit reversed the Court's "judgment in favor of the government, and conclude[d] that the government is liable to Campbell for her injury. Having determined that the government is liable to Campbell, we remand to the district court for proceedings to determine the appropriate damage award." Campbell v. United States, 732 Fed. App'x 611, 612 (9th Cir. 2018). After the Court held a status conference with the parties and set a briefing schedule on damages, (Dkt. Nos. 173, 174), Plaintiff filed her supplemental brief on November 1, 2018. (Dkt. No. 175.) The government filed its response on November 29, 2018. (Dkt. No. 176.) After leave of Court, Plaintiff filed a reply on December 11, 2018. (Dkt. Nos. 182-84.)

## Factual Background[3]

Plaintiff is a Professor and Associate Dean of the School of Education at Point Loma Nazarene University in San Diego, CA. Her job involves both administrative and teaching

---

[1] The City of San Diego was also named as a Defendant but shortly before trial, Plaintiff and the City of San Diego settled. (Dkt. No. 140.) On November 8, 2016, the Court granted Plaintiff and City of San Diego's joint motion to dismiss the City of San Diego. (Dkt. Nos. 156, 157.)

[2] "Premises liability is a form of negligence . . . ." Brooks v. Eugene Burger Mgmt. Corp., 215 Cal. App. 3d 1611, 1619 (1989).

[3] The facts are taken from the Court's Findings of Fact in the Memorandum Decision as well as the evidence concerning damages presented at trial.

duties.  Throughout her life, Plaintiff has been physically active.  During high school, she was captain of the Varsity softball, soccer and tennis teams.  She attended University of San Diego on a tennis scholarship.  After college, she continued to play softball and tennis recreationally.

Around 2006 or 2007, Plaintiff was diagnosed with Lupus, an autoimmune deficiency where the body attacks itself.  Due to the diagnosis, she has symptoms of deep joint pain and fatigue.  Her physical activities help with her symptoms including making her less fatigued.  Prior to the accident, she played tennis before work, worked out at the gym at midday with colleagues and students, and took vigorous walks.

She started biking when she met David Ellison ("Ellison"), now her husband, in 2008.  Being active was very important to their relationship.  Every Sunday, Plaintiff and Ellison would take a four to five hour bike ride.  They also took brisk walks of up to five miles and when they traveled, their vacations were always very active and included biking, hiking and walking.

On September 2, 2012, Plaintiff and Ellison took their weekly Sunday bike ride and while biking at a steady fast pace around 7 miles per hour on a dirt sidewalk along the 2500 block of Midway Drive, Plaintiff felt a sting on her right foot.  (Dkt. No. 146, Campbell Test. at 240:3-7; 241:1-13, 18-24.)  Then her bike began to wobble and she hit the fence with her right upper body, including her shoulder.  (Id.)  She got scared as she noticed something was missing on her foot.  (Id. at 242:9-10.)  With napkins, she put pressure on top of her toe and elevated her foot.  (Id. at 242:18-22.)  At the ER, she expressed that she was really worried, anxious and very upset wondering what she would be able to do and what her toe would look like.  (Id. at 245: 22-25.)  At the hospital, a doctor performed surgery to amputate the top of her toe.  (Id. at 266:5-7.)

When she went home that night, it was "very, very painful" even though she had gotten a shot in the toe to dull the pain.  (Id. at 246:3-9.).  She testified that it was the most pain she had ever experienced with any injury.  (Id. at 246:8-9.)  Shortly after the incident, she was not able to exercise at all.  She had a lot of doctor appointments from September

2012 to March 2013 including shoulder surgery at the end of January 2013. (Id. at 248:5-18.) She had never received any treatments for her shoulder before the injury. (Id. at 249:6-7.)

Because of the incident, Plaintiff's right toe is oddly shaped and is usually red and swollen after she wears shoes all day. (Id. at 250:18-20.) A growth forms on her toe that gets really hard and round and grows up instead of forward so she has to cut it down continually. (Id. at 250:22-251:4.) Even after four years, her toe is very sensitive to the touch. (Id. at 251:17-18.)

Plaintiff testified that she has shoulder pain every day describing it as "dull little pain" or that it feels sore each day. She always puts ice on her shoulder after any activity. (Id. at 251:22-252:4.) As to her toe, she does not have pain when she is wearing sandals or is not wearing shoes. (Id. at 252:6-7.) She has also experienced pain and soreness on the rest of her foot due to developing calluses and intentionally walking with her toes up so it does not touch anything. (Id. at 252:10-17.) As to her activities, she always has to wrap the toe. (Id. at 252:20-24.) During an activity, she stops every once in a while to adjust the way she walks or adjust her shoe. (Id. at 253:2-7.) Concerning her sleep, she has learned how to lay down so her foot does not touch anything, as her affected toe is very sensitive and requires frequent readjustment of her foot whenever she moves it. (Id. at 253:16-254:6.) As for getting ready for work in the morning, she can no longer wear heels but instead wears brown shoes that nurses wear and states she does not feel professional anymore. (Id. at 254:10-21.) As for relationships with her family, she is not enjoying activities with her family as she used to. (Id. at 256:1-9.) As to Dave, her husband, she feels guilty because he is doing all the chores at home and will not be able to do what they dreamed about doing anymore. (Id. at 256:10-23.) On the day of the incident, she was wearing open-toed sandals. (Id. at 260:4-5, Ex. 122.)

Plaintiff testified that at the ER, she denied falling or having any other trauma other than her toe. (Id. at 265:13-266:4.) She went to physical therapy in September 2012 for her shoulder. (Id. at 267:7-268:3.) She also had an outpatient surgical procedure on her

4

right shoulder on January 28, 2013 and did not undergo physical therapy after that. (Id. at 268:10-25.)

Prior to the incident, because of lupus, she had periodic pain in different parts of her body including her wrists, knees, hips and/or shoulders. (Id. at 269:21-270:22.) She saw Dr. Nguyen, a rheumatologist, for her lupus. (Id. at 270:20-22.) The pain in her shoulders would come and go over the years and would stay for weeks at a time. (Id. at 271:1-4.) Back in 2009, Plaintiff complained of persistent pain in her right shoulder. (Id. at 271:15-17.) Prior to the accident, shoulder pain affected her sleep. (Id. at 273:13-16; 22-24.)

Plaintiff became associate dean at Point Loma Nazarene University in 2009 and became tenured in 2013, after the incident. (Id. at 275:19-24.) Since the incident, Plaintiff goes to the gym two to three times a week. (Id. at 276:19-21.) She walks about an hour and ten minutes but with breaks. (Id. at 276:17-18.)

David Ellison, her husband, testified that being active was an important part of their relationship and is how they connected. (Dkt. No. 145, Ellison Test. at 113:18-114:1.) Their vacations were always geared around physical activity such as biking, hiking and walking. (Id. at 117:20-25.) They took bike rides every Sunday. (Id. at 122:4-9.)

Her husband testified that at the ER, she was in pain and on that day or the next day, she complained about shoulder pain. (Id. at 131:16-132:12.) He explained she had been diagnosed with lupus and from time to time it presented itself in her joints and triggered general achiness which was never acute. (Id. at 149:24-150:10.) Since the incident, the duration and frequency of her activity level have decreased. (Id. at 150:16-22.) She works out two to three times a week instead of six or seven days a week. (Id. at 151:1-4.) Her duration on machines is limited to 20 minutes whereas before the incident she would exercise 45 minutes to an hour. (Id. at 151:3-20.) After the incident, he and Plaintiff did not bike for a couple of years and now go occasionally but choose the flattest route and do not bike as far as they used to. Whereas they used to be out for four to five hours, now they bike about two hours, and as opposed to every Sunday, they bike once a month or every six weeks. (Id. at 151:23-152:8.) As for walking, her speed is not there as there is

always discomfort because of the calluses around the perimeter of her foot.  (Id. at 153:1-11.)  They also do not go on walks every week like they did but now go every other week.  (Id. at 153:12-16.)  On their vacation to London after the injury, they spent most of their time on double-decker buses instead of biking or walking.  (Id. at 154:1-10.)

Plaintiff complains about experiencing pain in her toe once or twice a week and pain in her shoulder one to two times a week.  (Id. at 155:23-156:21.)  In contrast, prior to the incident, she rarely complained of pain even with her lupus.  (Id.)  To alleviate the pain in her shoulder, she uses ice and ibuprofen.  (Id. at 157:4-6.)

Kelly Truesdale, Plaintiff's 23 year old daughter, similarly testified that prior to the incident, their family vacations were very active.  (Id. at 188:20-189:8.)  She similarly testified that she works out less; instead of working out for one hour she goes for half an hour.  (Id. at 190:22-191:4.)  She goes to the gym one to three times a week.  (Id. at 191:21-192:1.)  She also noticed a hitch in Plaintiff's step when she is walking.  (Id. at 192:23-193:1.)

Dr. James Johnson has been a colleague of Plaintiff for 10 or 15 years and is also a personal friend.  (Dkt. No. 146, Johnson Test. at 230:2-6; 231:22-23.)  Shortly after the incident, he noticed a change in Plaintiff's gait; she walks with a hitch trying to protect the pain in her foot and she has pain in her shoulder.  (Id. at 230:24-231:6.)  When they are sitting alone, he notices Plaintiff's pain by her facial expressions such as when she reaches for her shoulder.  (Id. at 232:2-9.)  The quality of her work has not been affected but he notices a drain on her energy level when she presents.  (Id. at 236:10-20.)

## A. Medical Testimony

Dr. Michael Quinn, Plaintiff's treating podiatrist, saw Plaintiff after her wound had already healed and she had a built up callus at the end of her toe.  (Dkt. No. 151, Dr. Quinn Test. at 322:7-9.)  He opined that Plaintiff was having pain at the end of her second toe because of scar tissue that had formed and her toe was flexing slightly causing her to bear more weight at the end of the toe.  (Id. at 322:13-323:5.)  He prescribed conservative treatment such as use of a pumice stone to break down her callus buildup, and the use of

pads and splints to keep the second toe from touching or having friction with the ground. (Id. at 324:21-325:8.)  On cross-examination, he testified that Plaintiff walks from heel to toe with a normal gait.  (Id. at 325:23-326:8.)  He also stated that the use of the toe crest pad was beneficial.  (Id. at 328:25-329:8.)

Plaintiff's expert, Dr. Benjamin DuBois, an orthopedic surgeon specializing in shoulder surgery, examined Plaintiff on five different occasions and reviewed her medical records.  (Dkt. No. 146, Dr. DuBois Test. at 284:19-20; 285:15-286:2.)  He diagnosed her with right shoulder AC joint pathology, including an AC joint sprain and subacromial bursitis and impingement.  (Id. at 287:2-5.)  He opined that her shoulder injury was caused by the incident on September 2, 2012.  (Id. at 290:25-291:2.)  He explained that the subacromial bursitis is very thin and can get damaged from trauma.  (Id. at 287:11-17.) She continues to have problems with her right shoulder particularly a significant problem with the AC joint.  (Id. at 291:14-20.)  Without any more care in the future, he expects she will have ongoing pain and some mechanical symptoms such as popping/clicking, and difficulty with daily living, exercise and sports.  (Id. at 299:21-25.)

On cross-examination, he testified that two weeks before the incident, on a visit with Dr. Nguyen, Plaintiff reported pain in her right shoulder when she reaches over and at night when she lies down and that, as a result, she ordered x-rays of Plaintiff's right shoulder in August 2012.  (Id. at 308:3-18.)

On redirect, Dr. DuBois explained that Plaintiff has been suffering from lupus for over five or six years, with periodic episodes of flareups and remission.  (Id. at 209:17-22.) He noted that none of her prior treatments were invasive: she had no cortisone shots, did not attend physical therapy, never had an MRI, had never seen an orthopedic surgeon and never had surgery.  (Id. at 309:23-310:5.)  She still has lupus and still complains about parts of her body but none have required any intervention.  (Id. at 310:16-20.)  The MRI taken in mid-September 2012 shows a significant pathology at her AC joint where there was bone edema, which is bone bruising, of bones around the joint indicating significant injury to the AC joint.  (Id. at 311:5-312:6; 313:3-9.)  "Essentially, it is a bone bruise."  (Id. at

312:5-6.)  These were objective findings of traumatic injury shortly after the bicycle incident.  (Id. at 312:24-313:1.)  Therefore, he opined that her shoulder injuries were from the bicycle crash.  (Id. at 313:10-13.)

Dr. Jeffrey Bruffey, a board certified orthopedic surgeon, testified on behalf of the government.  (Dkt. No. 151, Dr. Bruffey Test.)  Prior to the incident, there were medical records of a chronic problem with Plaintiff's right shoulder dating back to 2009, where her treating rheumatologist, Dr. Nguyen, noted her persistent right shoulder pain and diagnosed her with right shoulder tendonitis.  (Id. at 337:3-12.)  She has systemic lupus erythematosus, an autoimmune condition, which can cause inflammation in the body particularly related to joints in different areas.  (Id. at 337:21-25.)  She was referred to physical therapy in 2009 for her shoulder.  (Id. at 338:8-9.)  On another visit in August 2012, Plaintiff described pain in the right shoulder which bothered her when she rolled over and turned over at night and brought her arm across her body.  (Id. at 338:19-24.)  On exam, Dr. Nguyen described tenderness and swelling in her right AC joint and conducted an impingement test.  (Id. at 338:25-339:9.)  Prior to the incident, Plaintiff suffered two types of impingement: one in the AC joint and a rotator cuff impingement.  (Id. at 339:15-340:5.)  An MRI was conducted in September 2012.  (Id. at 340:8-9.)  Dr. Nguyen's notes do not mention that the flare-up was due to lupus and in fact, noticed that the lupus was actually better.  (Id. at 340:17-25.)  The shoulder pain prior to the incident in September 2012 was due to impingement caused by overuse or normal wear and tear of the shoulder over time.  (Id. at 341:1-9.)

At the time of the incident, when Plaintiff was at the ER, there was no mention of any trauma to the shoulder.  (Id. at 343:20-344:24.)  The notes specifically stated there was no fall and no other trauma.  (Id. at 345:10-12.)  Shortly after the ER report in September 2012, she saw her primary care physician to have her sutures removed and the wound was assessed but there was no mention about any shoulder pain.  (Id. at 345:20-346:8.)

As for the toe, Dr. Bruffey reviewed Dr. Quinn's treatment records which indicated she was in continued pain and stiffness with post-traumatic deformity in the toe, and some

callus formation. (Id. at 346:15-21.) There was discussion of additional surgeries if it remains painful and difficult to manage. (Id. at 346:22-25.)

An MRI of Plaintiff's shoulder was done on September 15, 2012. (Id. at 347:15-17.) It revealed acromioclavicular joint arthritis, rotator cuff impingement, and bursitis. (Id. at 348:10-15.) She also attended physical therapy in September 2012 and the notes reveal the first mention of the fall related to the bicycle accident. (Id. at 348:25-349:7.) Her shoulder pain worsened during physical therapy and then the therapy records end. (Id. at 349:12-13.)

According to Dr. Bruffey, Plaintiff was subsequently seen by Dr. Steven Tradonsky, an orthopedic surgeon, who diagnosed her with an AC/acromioclavicular joint arthritis and joint impingement. (Id. at 349:17-350:7.) He recommended steroid injections for the inflammation but it did not provide relief for her. (Id. at 350:1-13.) Dr. Tradonsky then performed right shoulder surgery, an anthroscopy, in January 2013. (Id. at 350:14-16.) Post-surgery, Dr. Tradonsky indicated the surgery was successful and did not recommend any further visits with him or to physical therapy. (Id. at 352:15-22.) Dr. Bruffey concluded the shoulder problem was a pre-existing condition and was symptomatic requiring treatment right before the incident and not changed by the accident. (Id. at 354:7-18.) He also found significant that the ER records do not indicate any shoulder injury or treatment. (Id.)

On cross examination, Dr. Bruffey was not aware that Plaintiff had seen Dr. Nguyen in March 2010 and had not mentioned shoulder pain. (Id. at 359:24-360:13.) The record notes no swelling, warmth, tenderness or deformities in upper extremity on that visit. (Id. at 360:14-16.) Again, on June 6, 2011 and then July 5, 2012, further visits to Dr. Nguyen do not mention any shoulder pain although her lupus was bad in July 2012. (Id. at 361-1:362:10.) Plaintiff also saw her primary care physician on June 5, 2011, June 20, 2012 and July 30, 2012 and there was no mention of shoulder problems. (Id. at 366:8-25.) In fact, on July 30, 2012, her primary care doctor wrote, "shoulder is normal." (Id.)

////

## Discussion

Plaintiff seeks non-economic damages which include past and future physical pain, mental suffering, emotional distress, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation and loss of enjoyment of life in the range of $900,000 to $1,000,000. Defendant does not dispute the evidence supporting non-economic damages but argues that the amount sought is excessive and that an award of $50,000 to $100,000 is reasonable for past and future pain and suffering.

The Federal Tort Claim Act ("FTCA") makes the federal government liable to the same extent as private individuals under like circumstances in accordance with California law. 28 U.S.C. §§ 1346(b)(1); 2674. In California, the general rule of damages in tort is that the injured party may recover for all detriment caused whether it could have been anticipated or not. Cal. Civ. Code § 3333.

A plaintiff may recover general or non-economic damages for past and future pain and suffering from a defendant's negligence. Capelouto v. Kaiser Fdn. Hosp., 7 Cal. 3d 889, 892–93 (1972). "'Non-economic' damages are such 'subjective, non-monetary losses [as] pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation.'" DaFonte v. Up–Right, Inc., 2 Cal. 4th 593, 600 (1992) (quoting Cal. Civ. Code § 1431.2(b)(2)). "[A] tort plaintiff may recover prospective damages, as long as it is sufficiently certain that the detriment will occur." Boeken v. Philip Morris USA, Inc., 48 Cal. 4th 788, 799 (2010); see Cal. Civ. Code § 3283. "[I]t is settled in this state that mental suffering constitutes an aggravation of damages when it naturally ensues from the act complained of, and in this connection mental suffering includes nervousness, grief, anxiety, worry, shock, humiliation and indignity as well as physical pain." Crisco v. Sec. Ins. Co. of New Haven, Conn., 66 Cal. 2d 425, 433 (1967). The term pain and suffering "reflects a consequence of [a victim's] personal and physical injury and a subjective loss for which money could compensate the victim." Nakamura v. Superior Ct., 83 Cal. App. 4th 825, 835 (2000).

"Pain and suffering" is a "unitary concept" which "serve[s] as a convenient label

10

under which a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." Capelouto, 7 Cal. 3d at 892-93; Davis v. Superior Ct., 7 Cal. App. 4th 1008, 1015-16 (1992). Determining an award for pain and suffering is difficult because it is based on intangibles and there is no fixed standard. Trevino v. United States, 804 F.2d 1512, 1515 (9th Cir. 1986); Corebaum v. Lampkin, 215 Cal. App. 4th 1308, 1332 (2013). California courts have recognized that there is no definite standard or method of calculation to determine a reasonable compensation for pain and suffering but only that the award be reasonable in light of the evidence presented. Loth v. Truck-A-Way Corp., 60 Cal. App. 4th 757, 764 (1998). Damages must only be reasonable. See Cal. Civ. Code § 3359.

**A. Non-Economic Damages[4]**

Plaintiff seeks $250,000 for past pain and suffering and between $650,000 to $750,000 for future pain and suffering but provides no methodology or bases underlying the amount of non-economic damages she seeks. Defendant responds that based on damage awards in similar type cases in California, an award between $50,000 and $100,000 is reasonable.

While a plaintiff is not required to prove the exact of damages, an award of damages cannot be based on speculation. CACI 3901. In the Ninth Circuit, in determining whether a damage award is excessive in FTCA cases, the court compares "the sum to other awards in similar cases within the jurisdiction." Shaw v. United States, 741 F.2d 1202, 1209 (9th Cir. 1984) (reducing district court awards of non-economic damages of $5 million to $1 million after looking at awards in other similar cases); see McCarthy v. United States, 870

---

[4] While not clear, to the extent Plaintiff seeks to obtain a separate damage amount for each type of pain and suffering, (Dkt. No. 175 at 6), such damages are not provided by California law. See Capelouto, 7 Cal. 3d at 892-93 ("pain and suffering" is a "unitary concept"); Loth, 60 Cal. App. 4th at 763 (loss of enjoyment of life is a component of pain and suffering and not calculated as a separate award from pain and suffering); see e.g., Huff v. Tracy, 57 Cal. App. 3d 939, 943 (1976) ("California case law recognizes, as one component of general damage, physical impairment which limits the plaintiff's capacity to share in the amenities of life . . . Commentators have pointed out that the enjoyment-of-life instruction opens the possibility of double compensation.").

F.2d 1499, 1499-1500 (9th Cir. 1989) (reducing $200,000 for past pain and suffering to $100,000 and $2 million for future pain and suffering to $1 million to infant who received substandard treatment at delivery by comparing "challenged award to awards in similar cases in the same jurisdiction."); Trevino v. United States, 804 F.2d 1512, 1515 (9th Cir. 1986) (reducing $2 million for child's pain and suffering to $1 million after comparing awards in similar cases); Spitzke v. United States, No. 88-6261, 1990 WL 131720, *4 (9th Cir. Sept. 11, 1990) (unpublished) (award of $2.5 million pain and suffering damages was not excessive after comparing awards of other similar cases). Recognizing that each case "stands on its own facts" and determining whether non-economic damages is excessive is a difficult question, courts must, nevertheless "maintain some degree of uniformity in cases involving similar losses." Shaw, 741 F.2d at 1209 (citation omitted). Even if other cases are not directly on point, they can provide substantial guidance. Id. (noting that the two cases the court relied on were not directly on point yet they provided substantial guidance.)

In response, Plaintiff, relying on Eighth Circuit authority, argues that the Court should not rely on other verdicts to determine damages because each plaintiff's injuries are different and unique. However, the Court is required to apply Ninth Circuit law. Therefore, in applying Ninth Circuit law, the Court must look to comparable cases in California to determine a reasonable damages award for non-economic damages. See Spitzke, 1990 WL 131720, at *4 ("Because the law of the state where the tort occurred controls the measure of damages to be awarded, the comparison cases must be those that show the amounts of damages awarded in similar cases in that state.").

In its brief, the government provides a list of cases awarding damages in California state court with comparable toe injuries consisting of amputated or deformed toes and which are adjusted for inflation. After a review of the cases, the Court finds the following cases to provide some guidance as to an appropriate noneconomic damages award to Plaintiff but notes that all except one[5] of the cases cited by the government provide a lump

---

[5] The one case involved an eight year old girl who suffered a near amputation of a left toe as well as complex regional pain syndrome and depression due to chronic pain when her foot got caught in a slide in a public park. A.N. Pro Ami, Oviatt v. City of Palm Springs, 2014 WL 8104260 (Riverside Cnty. Super. Ct. Aug. 2014). She was

sum damages award and does not distinguish between economic and non-economic damages.

In one extreme case, a 36 year old male suffered amputation of all five toes when his foot was caught in a printing press. Rivera v. Miller Printing Co., 1985 WL 352502 (Santa Clara Cnty. Super. Ct. June 1, 1985). The total verdict was $64,880 after the plaintiff was found 90 percent negligent or $648,800 (or $1,514,109.87 in 2019[6]) if the defendant was 100% liable. No distinction is noted between economic and non-economic damages.

In another case, a seven year old male suffered amputation of his left, great toe at the proximal metatarsal joint, requiring a skin graft, when he was struck by the defendant's lawn mower, which was being operated by the defendant's 15-year-old son. Total damages awarded was $56,000 (or $100,228.04 in 2019) but does not distinguish between economic and non-economic damages. Madden, Pro Ami. v. Gentry, 1992 WL 520968 (Monterey Cnty. Super. Ct. Sept. 1992).

Next, Plaintiff v. Defendant, M.D., 1997 WL 372123 (Alameda Cnty. Super. Ct., Apr. 1997), involved a medical malpractice case where a doctor performed surgery causing a 55 year old female's big toe to be angled, creating a hammer toe and she could no longer work in her job that required her to be on her feet eight hours a day. She was awarded a total of $83,000 (or $129,855.96 in 2019) but no indication what portion was attributable to non-economic damages.

In one case involving a doctor's medical malpractice case, an 82 year old female suffered gangrene resulting in amputation of her third left toe after the defendant podiatrist negligently performed surgery. The jury awarded $25,000 (or $46,091.59 in 2019) and plaintiff's medical expenses were paid by collateral sources. Duffy v. Lemmer, D.P.M., 1991 WL 453842 (Santa Cruz Cnty. Super. Ct. Nov. 1991). Again, the verdict award does

awarded $40,000 (or $42,428.19 in 2019) for pain and suffering and $6,342.00 for past and future medical expenses. The Court does not find this case similar as the eight year old girl did not suffer an amputation of her toe.

[6] The government uses https://www.usinflationcalculator.com to adjust the damages award in these state court cases for inflation which Plaintiff has not objected to.

not differentiate between the amount awarded for non-economic damages.

Finally, in <u>Butcher v. Queen City Iron & Metal Co.</u>, 99 Cal. App. 2d 25 (1950), the court of appeal affirmed the jury verdict of $15,000 (or $156,290.66 in 2019) in favor of a plaintiff who suffered the amputation of his right great toe which caused him to have a permanent limp and the circulation in the lower end of his right foot was permanently impaired and could require further amputation of section of his foot or leg. <u>Id.</u> at 28. No distinction was made between economic and non-economic damages.

In this case, Plaintiff suffered amputation of the top of her right second toe resulting in a permanent disfigurement. Plaintiff endured severe pain when she struck her right toe on the metal post and that night when she went home from the hospital. The injury also made her anxious and upset about what she would be able to do physically and how it would look. Even though her right toe has healed, it is still, four years later, sensitive to the touch and she avoids anything to contact her toe. As a result, she walks with a hitch and has developed calluses and soreness in her foot. She continues to experience pain in her toe and her foot.

Plaintiff has also suffered a permanent impairment to her ability to enjoy life due to a reduction in the level of her physical activities. This reduction is more significant to her than most individuals as physical activity was part of her identity or as she testified "it's a piece of my, like, DNA . . . it's almost an addiction." (Dkt. No. 145, Campbell Test. at 210:8-11.). Plaintiff has been an athlete her entire life having started playing girls' softball at age six. At age 12, she was the only girl on the Point Loma All Star baseball team. (Dkt. No. 145, Ellison Test. at 109:14-22.) In high school, she was captain of the Varsity softball, soccer and tennis teams. She also received an athletic scholarship for tennis in college. Even after college, she continued to play softball and tennis recreationally and worked out daily. She was also physically active with her husband and it was an important part of their relationship. She took up biking when she met David and they took four to five hour bike rides every weekend, took brisk walks for up to five miles and their vacations always involved walking, hiking and biking. She was also physically active with her children as

demonstrated by their active vacations. Moreover, she is inconvenienced as she needs to make accommodations to sustain her reduced physical activities such as the need to rest more frequently and bandaging her toe prior to any physical activity. The reduction in physical activity has impacted her marriage and family relationships.

Not only did she enjoy sports and working out, but being physically active improved her lupus symptoms, which caused her "deep joint pain and fatigue." (Dkt. No. 145, Campbell Test. at 210:24-25.) She testified that exercise reduced her joint pain and fatigue. (Dkt. No. 146, Campbell Test. at 237:19-238:2.) She explained that when she first visited the doctor concerning her lupus symptoms, he was amazed at how healthy she looked compared to what her blood work showed. (Dkt. No. 145, Campbell Test. at 211:20-212:11.) Working out all the time has kept her joints moving and her organs running well and she feels physically well. (Id.) She was further motivated to continue her physical activities knowing her lupus could negatively affect her permanently if she was not active. (Id. at 212:14-20.)

After the incident, the intensity level and frequency of Plaintiff's activities have dropped significantly by over 50%. The Court finds significant her permanent impairment to enjoy life as physical activity was an extremely important part of her life and helped keep her lupus symptoms in check. In addition, the Court finds important Plaintiff's permanent anxiety about her lupus condition worsening due to the reduced level of physical activity. In consideration of the factors discussed above, the Court awards Plaintiff $100,000 for past pain and suffering and $115,000 for future pain and suffering for the injury to her right toe.

As to her right shoulder, the Court finds that while her shoulder pain was a pre-existing condition, the incident exacerbated her shoulder condition which required surgery in January 2013. The Court finds Dr. DuBois' testimony credible as to whether Plaintiff's exacerbated shoulder pain was caused by the incident. Based on objective medical evidence, he testified that an MRI taken in mid-September, after the incident, showed bone edema or bone bruising at her AC joint which is caused by a significant injury or trauma

to the AC joint. (Dkt. No. 146, Dr. DuBois Test. at 311:5-312:6.) Moreover, Dr. DuBois noted that even though she had suffered from lupus for over five or six years with period episodes of flare ups, she never required invasive treatment. While Plaintiff expressed shoulder pain to Dr. Nguyen prior to the incident in August 2012, she also expressed shoulder pain in 2009 when she was referred to physical therapy for her shoulder. (Dkt. No. 151, Dr. Bruffey Test. at 337:3-338:16.) It is not indicated whether Plaintiff went to a physical therapist in 2009 but no other invasive treatment was prescribed or undertaken by Plaintiff. Dr. Tradonsky, the orthopedic surgeon who conducted the shoulder surgery indicated the surgery was successful and did not recommend any future visits with him or to physical therapy. (Dkt. No. 151, Dr. Bruffey Test. at 352:15-22.)

Neither party has provided any similar award cases for an exacerbated shoulder injury. Accordingly, upon the Court's review, it finds the case of Cantu v. United States, Case No. CV 14-219-MMM(JCGx), 2015 WL 4720580, at *36 (C.D. Cal. Aug. 7, 2015) informative involving a car accident where the plaintiff's vehicle flipped over. In that case, instead of the $100,000 plaintiff sought, the court awarded $15,000 for non-economic damages of pain and suffering for a shoulder injury as well as pain and anxiety about his family's uncertain financial future. Id. The court explained that the severity of his injuries and its likely future impact was not supported by the evidence. Id. There was contradictory medical evidence and the court ultimately concluded that the evidence did not support the severity of the plaintiff's claimed injuries. Even though the orthopedic surgeon recommended "anthroscopy, subacromial decompression and distal clavicle resection" surgery to the left shoulder, there was contrary medical evidence that surgery was not necessary due to the lack of objective finding of pathology. Id. at *13-18. The court concluded that the medical treatment following the accident was unnecessary and it did not appear future medical treatment was necessary. Id. at *36. The court recognized the plaintiff suffered pain from the injury and time off from work can cause anxiety and stress concerning financial hardships and awarded pain and suffering of $15,000. Id.

Here, Plaintiff had a pre-existing shoulder condition and the evidence demonstrates

that the incident exacerbated her condition to the point it required surgery. Therefore, the Court awards Plaintiff $10,000 for past pain and suffering based on her exacerbated shoulder condition. As to future pain and suffering, Dr. Tradonsky indicated that the surgery was successful and that she will not need physical therapy although she testified she has a "dull little pain" every day in her shoulder and has to ice it after any activity. The Court awards Plaintiff $10,000 for past pain and suffering and $10,000 for future pain and suffering for the exacerbated injury to her right shoulder.

### B. Comparative Fault

Defendant argues that its liability must be reduced by the negligence of both Plaintiff and the City of San Diego. Plaintiff rejects Defendant's contention arguing that this Court, in its Findings of Fact and Conclusions of Law, did not find that Plaintiff or the City of San Diego bore any comparative fault for the accident and did not raise the issue on appeal. Moreover, the Ninth Circuit opinion does not address or suggest that Plaintiff bore any liability for her injuries or that the City of San Diego was liable. Finally, even if Court could conduct an apportionment analysis, no evidence was offered at trial to demonstrate the City's fault in the case.

Neither party has addressed the Court's ability to address comparative fault, an issue not addressed by the Ninth Circuit, upon remand. "According to the rule of mandate, although lower courts are obliged to execute the terms of a mandate, they are free as to 'anything not foreclosed by the mandate . . . .'" United States v. Kellington, 217 F.3d 1084, 1082-93 (9th Cir. 2000) (quoting Herrington v. Cnty. of Sonoma, 12 F.3d 901, 904 (9th Cir. 1993)). Upon return of its mandate, the district court cannot give relief beyond the scope of that mandate, but it may act on "matters left open by the mandate." In re Sanford Fork & Tool Co., 160 U.S. 247, 256 (1895).

"On remand, courts are often confronted with issues that were never considered by the remanding court." Biggins v. Hazen Paper Co., 111 F.3d 205, 209 (1st Cir.), cert. denied, 522 U.S. 952 (1997). In such cases, "[b]roadly speaking, mandates require respect for what the higher court decided, not for what it did not decide." Id. (citing Rogers v. Hill,

289 U.S. 582, 587–88 (1933)); Sierra Club v. Penfold, 857 F.2d 1307, 1311-12 (9th Cir. 1988).

As we noted in Nguyen v. United States, "although the mandate of an appellate court forecloses the lower court from reconsidering matters determined in the appellate court, it 'leaves to the district court any issue not expressly or impliedly disposed of on appeal.'" 792 F.2d 1500, 1502 (9th Cir. 1986) (quoting Stevens v. F/V Bonnie Doon, 731 F.2d 1433, 1435 (9th Cir. 1984)), and holding that mandate ordering entry of summary judgment in favor of defendant required district court to enter summary judgment but did not preclude court from allowing plaintiff to amend complaint immediately thereafter)); Caldwell v. Puget Sound Electrical Apprenticeship & Training Trust, 824 F.2d 765, 767 (9th Cir. 1987) (where mandate stated that "judgment for [plaintiffs], including back pay, costs, and attorney's fees, is REVERSED," without remanding or mentioning front pay award, district court acted "consistent with mandate" by assuming jurisdiction after entry of judgment and granting defendants' restitution of front pay).

In this case, the Ninth Circuit only considered the issue raised on appeal, whether the government's negligence caused Plaintiff's injury. The issue of Plaintiff's comparative negligence or the City of San Diego's comparative liability was not raised and consequently not addressed by the Ninth Circuit. Therefore, these issues may be considered on remand and the Court looks to the trial record to determine if the government met its burden to demonstrate either Plaintiff's comparative negligence and/or the City of San Diego's comparative fault.

At trial, the government argued that Plaintiff contributed to her own injury by wearing open-toed shoes on a lengthy bike ride. Moreover, she chose to ride on an unpaved, uneven dirt path along a busy street and it was not clear that the sidewalk was designed for bicycles. Therefore, the government contends she substantially increased her likelihood of injury. Plaintiff argues that it was not negligent to ride a bicycle in sandals in San Diego where it is common to wear flip flops while biking. Moreover, Plaintiff and Ellison's decision to ride on the dirt path was because it was safer than riding on the street

18

where the cars drove quickly.

The government does not provide any legal authority or standard of care requiring a bicyclist to wear closed-toe shoes. It is not uncommon for bicyclists in San Diego at the end of summer to wear open-toed sandals or shoes. Moreover, the decision to ride on the sideward was made for safety reasons as the 2500 Midway Drive did not have a bicycle lane and cars drive fast on that road. (Dkt. No. Ellison Depo. at .) Therefore, the government has not demonstrated that Plaintiff contributed to her own injury.

As to the City of San Diego, the Court concludes that the government has not met its burden to demonstrate the City's fault or even the City's percentage of fault.

California Civil Code section 1431.2(a) provides that, "[i]n any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." Cal. Civ. Code § 1431.2(a).

A defendant, under section 1431.2 seeking an offset must prove the comparative fault of others, including settling defendants. Wilson v. Ritto, 105 Cal. App. 4th 361, 367 (2003) ("In determining a defendant's share of fault, the court may consider other joint tortfeasors' degree of fault for the plaintiff's injuries and reduce the defendant's share accordingly . . . . But unless there is substantial evidence that an individual is at fault, there can be no apportionment of damages to that individual.").

The government argues that it is undisputed that the City of San Diego owns a right-of-way over the pathway and exercised exclusive control over it but cites no evidence, either at trial or otherwise, to support this assertion. (Dkt. Nos. 153, 176.) It only cites to the parties' stipulated fact that on February 13, 2013, the City of San Diego, without prior notice to the United States, removed 20 metal posts adjacent to the fence including the post that Plaintiff injured her toe on. (Dkt. No. 144.) It argues that the City was in the best

position to protect Plaintiff or warn of the hazard. The government claims that its role in the incident was limited to cutting down a fence many years ago. In response, Plaintiff argues that the government did not offer any evidence to demonstrate the City's liability for an unreasonably dangerous condition of its property under California Government Code section 835 and failed to bear its burden of proof at trial for the affirmative defense. The Court agrees.

To demonstrate the City of San Diego was liable for the dangerous condition under California Government Code section 835[7], the government had to demonstrate by a preponderance of the evidence that "(1) the property was in a dangerous condition at the time of the injury; (2) the dangerous condition proximately caused the injury; (3) the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred; and (4)(a) a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the condition or (b) the public entity had actual or constructive notice of the dangerous condition in time to have taken measures to protect against it." Slapin v. Los Angeles Int'l Airport, 65 Cal. App. 3d 484, 488 (1976) (citing Cal. Gov't Code § 835).

At trial, the government did not present any evidence regarding the City of San Diego's right-of-way or control over the pathway except by implication through a stipulated fact that the City removed 20 metal posts without notifying the government.[8]

---

[7] Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or,

(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
Cal. Gov't Code § 835.

[8] Although not raised by the government, on summary judgment, the government and Plaintiff argued that the City of San Diego owned a right-of-way over the pathway. (Dkt. No. 43-1 at 3.) The City admitted it had jurisdiction over the right of way designation along Midway Drive for utilities, regulatory signs and for public

Furthermore, the government did not present any other evidence to support the City's liability under section 835.

The government has failed to demonstrate the City of San Diego's liability, and consequently, failed to demonstrate the City's apportionment of fault. See Rashidi v. Moser, 60 Cal. 4th 718, 721 (2014) (jury award of noneconomic damages in a professional negligence action against health care providers may not be further reduced by setting off the amount of a pretrial settlement attributable to noneconomic losses, when the defendant that went to trial failed to establish the comparative fault of the settling defendants). Thus, the Court declines to apportion the damages award.

**Conclusion**

Based on the above, the Court AWARDS Plaintiff $215,000 for past and future pain and suffering for the injury to her right toe and $20,000 for past and future pain and suffering for the exacerbated injury to her right shoulder for a total of $235,000.

IT IS SO ORDERED.

Dated: February 26, 2019

Hon. Gonzalo P. Curiel
United States District Judge

---

highlights. (Dkt. No. 71 at 17.) After a review of the evidence presented, the Court concluded there was a genuine issue of material fact as to whether the City, as owner of the right-of-way, had control over the dirt pathway. (Dkt. No. 71 at 17.) "Findings of fact on summary judgment perform the narrow functions of pinpointing for the appellate court those facts which are undisputed and indicating the basis for summary judgment; they are not findings of fact in the sense that the trial court has weighed the evidence and resolved disputed factual issues." Heiniger v. City of Phoenix, 625 F.2d 842, 843-44 (9th Cir. 1980). Therefore, the Court did not make any factual findings or weigh the evidence on summary judgment and the City's admission that it has a right of way for utilities, regulatory signs and the public highways does not resolve whether the City had control over the dirt pathway.

*Campbell v. Lockheed Martin, et al*
14cv2359 GPC (RBB)